UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

WIILY ULERIO                                                    **COMPLAINT**

                                    **Plaintiff**              18 CV2155 (    ) (    )

                                                               **Jury Trial Demanded**

              -against-


THE CITY OF NEW YORK;
SGT. WILLIAM EISEMAN, Shield No 00054,
Police Officer MICHAEL CARSEY, Shield No. 29056,
Police Officer ARMANDO PEREZ, Shield No. 14643,
Police Officer EURIS PAULINO
Individually and in their official capacities as then and now
NEW YORK CITY POLICE OFFICERS.

                                    **Defendants.**

-------------------------------------------------------------------------x


Plaintiff, **WILLY ULERIO**, by his attorney, **RUDY VELEZ, ESQ.**, complaining of the

defendants, the City of New York, and its employee police officers, collectively referred to as

Defendants, upon information and belief, alleges as follows:


## PRELIMINARY STATEMENT

1. This is a civil rights action in which the plaintiff, Willy Ulerio, seeks relief for the

   defendants' violation(s) of his rights secured by the Civil Rights Act of 1871, 42

   U.S.C § 1983, of the United States Constitution, including the Fourth, Fifth and

   Fourteenth Amendment. Plaintiff seeks to recover money damages arising out of the

   violation of these rights.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C §1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3. The Jurisdiction of this Court is predicated upon 28 U.S.C §§ 1331 and 1343.

4. Venue is proper in this district pursuant to 28 U.S.C §§ 1391 (b) and (c).

## JURY DEMAND

5. Plaintiff demands a trial by jury in this action.

## PROCEDURAL HISTORY

6. On April 4, 2017, the conviction of Willy Ulerio, finding him guilty by jury trial of Criminal Possession of a weapon in the Second Degree and Criminal Possession of Marijuana in the fourth degree was vacated by the New York County District Attorney's Office, and the trial court, Part 65, the Hon. Daniel J. Fitzgerald, a New York County Supreme Court judge of the criminal term joined in the New York County District Attorney's office recommendation to vacate Willy Ulerio's conviction of March 11, 2009, for the crimes listed herein.

7. On April 12, 2017, the aforementioned conviction was dismissed and all pending criminal charges related to this action were also dismissed by the Hon. Fitzgerald, D., then the presiding judge.

8. The above mentioned dismissal is a termination of the criminal action in favor of the accused pursuant to section 160.50 of the criminal procedure law. (See Exhibit A)

9. This action has been commenced within three years after the cause of action of Plaintiff accrued.

10. All of the claims herein present a federal civil rights violation.

## PARTIES

11. Willy Ulerio is a citizen of the United States and, at all times relevant to the claims arising herein, was a resident of the State of New York.

12. At all times relevant to this complaint, defendant Police Officers Armando Perez, Michael Carsey, Sergeant William Eiseman and Euris Paulino (hereinafter "defendant officers") were duly appointed and acting police offices for the New York City Police Department, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New York, the City of New York, and the New York City Police Department.

13. Defendant City of New York is a Municipal Corporation duly incorporated and existing pursuant to the laws of the State of New York, pursuant to Section 431 of its Charter. The City of New York has established and maintains a Police Department as a constituent department or agency of the defendant.

14. At all relevant times, the City of New York and its Police Department employed all of the individual defendant officers.

15. At all relevant tines, all of the individual defendants were agents, servants and employees of the City of New York acting within the scope of their employment by defendant City of New York and its Police Department.

## STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS

16. On October 10, 2007, Willy Ulerio was stopped by police who searched his van and found marijuana and a loaded gun. Four officers participated in the stop: Sergeant William Eiseman, and Michael Carsey, Armando Perez, Euris Paulino.

17. Willy Ulerio was charged in a felony complaint for marijuana and gun possession and on March 11, 2009 he was convicted of marijuana and gun possession under Indictment Number 5149/07.

18. After the guilty verdict and before the imposition of sentence, on October 15, 2010, (**See Exhibit E**) the prosecutor admitted to the court and to defense counsel that Sergeant Eiseman and police officer Carsey had recently been indicted on several charges of perjury and misconduct related to illegal searches and seizures during car stops, from August 2007 to July 2008: precisely the time Willy Ulerio's stop, arrest, and suppression hearing.

19. At the time Sergeant Eiseman stopped Willy Ulerio, he was engaged in widespread corruption and dishonesty, including ordering his subordinates to falsify paperwork to cover up illegal activity. (**See Exhibit G**)

20. Sergeant Eiseman regularly made illegal car stops and then manufactured evidence to make the stops appear legal, and testified falsely at several suppression hearings. (**See Exhibit B**)

21. Officer Carsey, who was Sergeant Eiseman's partner at the time of the illegal activity, was also convicted of such behavior in a case nearly identical to Willy Ulerio's. (**See Exhibit C**)

22. In addition, Sergeant Eiseman and Officer Carsey went to great and illegal lengths to head off any negative consequences, and Sergeant Eiseman ordered several subordinate officers to engage in similar cover-ups.

23. At the time of Willy Ulerio's arrest, in the early morning of October 10, 2007, Officer
    Armando Perez had been out of the police academy for "a little less than a year," and
    was assigned to the Impact Response Team of Manhattan.

24. He was in uniform, in a marked car patrolling with his sergeant, William Eiseman,
    and two other officers, Michael Carsey and Euris Paulino.

25. Officer Perez said he noticed a "mid-size" gold van double parked at 505 West 162nd
    Street around 1:30 am, with the driver's side closest to the curb.

26. One of the officers flicked the turret lights to encourage the van to move, bit it stayed
    put.

27. Officer Perez could not see in to the back of the van, whose windows were tinted.
    Because the van was not moving, Sergeant Eiseman drove along side the stopped
    vehicle, at which point Officer Perez claimed to smell the "strong smell of marijuana"
    coming from the van's open passenger window.

28. All four officers got out of their car and approached the van because of the alleged
    smell of marijuana and because the van allegedly "didn't acknowledge" the officers;
    Officers Carsey and Paulino stood on the driver's side where Ulerio was sitting and
    Officer Perez and Sergeant Eiseman stood on the passenger side where Johannes
    Meran was sitting.

29. Officer Perez claimed that, while standing behind Sergeant Eiseman, he could see
    through the passenger window, over the seated passenger, into the dark van, and to the
    floor between the front seats, where he observed a black plastic bag.

30. The black plastic bag was allegedly "open" so he could see directly inside.

31. He claimed that he could see that the bag contained a "whole bunch" of empty, one-inch square baggies with an apple printed on them; the bags are known as "apple baggies" and are used for packaging marijuana.

32. Officer Perez then began to shine his flashlight inside the van while standing outside.

33. Even though the glass was tinted, Officer Perez claimed he could see a box of Trix cereal lying in the back of the van; he claimed he could also see that the bottom of the cereal box was open and part of a zip-lock bag filled with "green type marijuana," stuck out of the box.

34. The box was lying exposed "in the back like towards the middle of the van," and even though there were clothes scattered about, the cereal box was not covered with any of these clothes.

35. Officer Perez told his sergeant what he saw, and Sergeant Eiseman ordered Ulerio and Meran out of the van and arrested them, moving them to the rear of the van.

36. Officer Perez stated he never heard anybody read Willy Ulerio his Miranda rights.

37. Officer Perez searched the interior of the van, and noticed a compartment in the back that was "falling apart" but had a snap on it.

38. He lifted the lid and saw a loaded pistol "plain view." Officer Perez again called Sergeant Eiseman over, who made the gun safe.

39. Officer Carsey issued a summons for the double-parked car.

40. The Criminal Court Complaint, filled out by Officer Carsey, stated that Officer Perez "observed defendant Ulerio in the driver's seat and defendant Meran in the passenger seat of a van double parked" at the location, and that Perez "recovered a fully loaded

.22 caliber revolver from the driver side, and a bag containing more than 16 ounces of marijuana from the floor of said van' (**See Exhibit D**).

41. On May 7, 2009, a hearing was held in New York County Supreme Court in order to determine the admissibility of the evidence seized and whether the police had violated Ulerio's constitutional rights in order to recover the evidence seized.

42. Armando Perez was the only police officer called by the People at the hearing.

43. During the course of the hearing, testimony revealed that the officers asked Ulerio and his friend to get out of the car and then handcuffed them

44. Ulerio stated he did not "know what's going on."

45. Once the men were out of the van, the police searched his van, but Ulerio did not give the officers permission to do so. Ulerio said he heard the officers "breaking everything and searching" in the car.

46. Without Mirandizing Ulerio, the officers asked him questions about where he got the marijuana, and once he was put into the police car they asked him who it belonged to.

47. After the hearing was conducted, the hearing judge denied the Motion to Suppress and set Ulerio's case for trial.

48. The case then proceeded to jury trial on March 4, 2009, before the Hon. Daniel J. Fitzgerald, in New York County Supreme Court, Part 65.

49. Armando Perez, Euris Paulino, and Michael Carsey graduated from the police academy together just three months before Ulerio's arrest and all testified at his trial.

50. Before Ulerio's arrest, Officer Perez had never arrested anybody for possessing a gun, and had only assisted in arresting three to five people for marijuana; Officer Paulino had participated in four marijuana arrests, and two gun arrests.

51. The experienced Sergeant William Eiseman in charge of the team did not testify.

52. Officer Perez testified that after Ulerio and Meran were arrested, he continued searching the van and found a black pistol in the back of the van on the driver's side in a compartment that was "falling apart" but that he had to open to see inside.

53. Officer Perez removed the gun, which was loaded and had tape around the handle, and gave it to Sergeant Eiseman. Officer Perez also noticed that the inside of the van was littered with clothes, including a black plastic bag full of clothes.

54. Under normal circumstances, it is the officer who recovers property who becomes the "arresting officer". In this case, however, Sergeant Eiseman assigned Officer Carsey to be the arresting officer for some unknown reason.

55. Officer Carsey vouchered the contraband, and at first asked the gun be tested for DNA but then crossed out that request.

56. On March 11, 2009, the jury found Ulerio guilty of Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of Marijuana in the Fourth Degree. The case was adjourned to April 25, 2009 for sentencing.

57. Prior to sentencing on October 15, 2010, the prosecutor filed a letter with Uliero's criminal trial counsel and with the court announcing that on June 30, 2010 Sergeant Eiseman had been Indicted on 13 counts related to various incidents in which Sergeant Eiseman participated in unlawful stops, detentions and/or searches of civilians and to situations in which he directed subordinates to falsify police paperwork in order to make the stops and searches appear legitimate (See Exhibit E).

58. Details of these indictments are attached as Exhibits B and C.

8

59. The prosecutor noted that Officer Carsey had also been indicted for 5 crimes, but did not reveal the date of this indictment. She provided defense counsel with a copy of the indictments.

60. According to a press release issued by the New York County District Attorney's Office on July 15, 2010, Sergeant Eiseman "was responsible for supervising and training newly-hired police officers" with the Manhattan North Task Force in 2007 (See Exhibit F)

61. The District Attorney's press release indicated that between August 2007 and the summer of 2008, Sergeant Eiseman was involved in four incidents in which he illegally stopped civilians in their cars.

62. Where subsequent searches "led to the recovery of contraband, Sergeant Eiseman ordered his subordinates to falsify their police paperwork in order to make stops and searches appear legitimate. (See Exhibit F)

63. Officer Carsey was involved in an incident during which he and Sergeant Eiseman illegally stopped and detained a car and then lied at the suppression hearing. (See Exhibit F)

64. District Attorney Cyrus R. Vance, Jr. noted that "(Sergeant) Eiseman's conduct was particularly troubling because he was in a position to mentor and train young officers in the department" (See Exhibit G) Details of these indictments are attached as exhibits B and C.

65. For example, according to the indictments, Sergeant Eiseman and Officer Carsey arrested Antoine Melville. On August 20, 2007. Sergeant Eiseman testified at Antoine Melville's suppression hearing on May 30, 2008 that he noticed a van illegally double

parked. He testified falsely that when he drove the police car next to the van, he noticed the "strong odor of marijuana." The driver's side window of the van was down, and Sergeant Eiseman claimed that he smelled marijuana coming from inside the car, and saw a cloud of smoke coming from inside the van.

66. Sergeant Eiseman used this spurious marijuana evidence to order Antoine Melville out of his van and illegally search it. Sergeant Eiseman and Officer Carsey lied at Antoine Melville's suppression hearing on May 30, 2008 and again on June 18, 2008.

67. Sergeant Eiseman and Officer Carsey were also charged with official misconduct for illegally searching Antoine Melville's iPhone, and Sergeant Eiseman was charged with official misconduct for illegally searching Antione Melville's person (Sergeant Eiseman Indictment Counts 1-4; Officer Carsey Indictment Counts 1-5)

68. According to the indictment, in another incident, on July 6, 2008, Sergeant Eiseman falsified an arrest report for suspect Carlos Garcia. (Count 5) and concealed, altered, or destroyed a written statement created by suspect Richard Rodriguez. (Count 6)

69. Sergeant Eiseman was also accused of illegally searching Richard Rodriguez's car trunk on the same day, after which he found cocaine (Count 7).

70. On July 17, 2008, Sergeant Eiseman falsified a reckless driving summons issued to Terry Boyd., committed official misconduct when he illegally searched Terry Boyd's car and his person, falsified the voucher statement filled out after money was recovered pursuant to Terry Boyd's arrest, and falsified a command log entry regarding Terry Boyd's detention.

71. In an incident during the Spring or Summer of 2008, Sergeant Eiseman engaged in official misconduct again when he illegally seized B.P. and another person for no apparent reason; he allowed them to leave only "after one of the people said that a

10

relative was employed as an Assistant District Attorney in Manhattan" (Count 13; **See Exhibit F**).

72. All of the cases against the defendants whose constitutional rights Sergeant Eiseman and Officer Carsey violated were dismissed.

73. On October 31, 2011, new counsel for Ulerio filed a motion to set aside the verdict, pursuant to C.P.L. S 330.30 (3), on the grounds that the indictments against Sergeant Eiseman and Officer Carsey constituted newly discovered evidence that, if known at the time at trial, would have changed the result.

74. Counsel noted that the "circumstances surrounding [Antione Melville's ] arrest bear a remarkable similarity to this at the case at bar" and, as noted in the District Attorney's press release, Sergeant Eiseman "'ordered his subordinates to falsify their police paperwork in order to make the stops and searches appear legitimate.'"

75. Because Sergeant Eiseman was "the head of the team [that arrested Ulerio}, the trial testimony would have been inherently suspect."

76. That Sergeant Eiseman himself did not testify at Ulerio's trial was not dispositive, given that he was accused of coaching his subordinate officers to alter their paperwork and testimony. Thus, the court could not be sure that any of the officers who testified were being truthful because Sergeant Eiseman may have coached them.

77. Counsel also argued that the new evidence would have made a difference at the suppression hearing: '[E]ven though the indicted officers did not testify at the hearing in question, their indictments if they had been known to the Court handling the suppression issue and the jury hearing the trial evidence would have certainly made it difficult if not impossible to sustain these charges."

78. On September 29, 2012, the trial court rejected defense counsel's motion to dismiss.

79. At sentencing on November 9, 2012, the prosecution recommended five years'
   incarceration.

80. Counsel asked for the minimum sentence of 3.5 years. Moreover, because the sergeant
   and arresting officer were indicted for perjury and falsifying reports, Ulerio should get
   the statutory minimum.

81. Ulerio had never been arrested or convicted of any crime, and according to the court
   itself, had never been "in trouble" and made all of his court appearances during the 3.5
   years he was out on bail awaiting sentencing.

82. During this time, Ulerio remained arrest free, and lived with his mother and
   grandmother.

83. Ulerio also had a son who was 6 years old at the time of his sentencing. Ulerio's
   family was present to support him in court. The Department of Probation
   recommended that Ulerio receive a Certificate of Relief from civil disabilities.

84. The court sentenced Ulerio to five years' imprisonment, to be followed by three years'
   post-release supervision in recognition of the fact that Ulerio "had been staying away
   from trouble in the few years he has been out there already.

85. Defendant appealed his conviction to the Appellate Division, First Department
   claiming among other things, that the trial court had erred in denying his CPL 330.30
   motion to set aside the verdict.

86. After oral argument, the Appellate Division remanded the case for a hearing to further
   develop the factual basis for the denial of Ulerio's motion.

87. Specifically, the Appellate Division sought additional factual information regarding "what the assigned prosecutor and the District Attorney's office knew about the veracity of the perjury complaint prior to the conclusion of Ulerio's trial.

88. The Appellate Division added that, during the new hearing, Ulerio could also clarify what information, if any, was shared between the corruption unit and the assigned prosecutor before Ulerio's trial and whether prior to the date referenced by the motion court, the People had specific information that the sergeant and Officer Carsey had engaged in misconduct, which the District Attorney's office should have disclosed.

89. In preparation for that hearing and in accordance with the directives of the Appellate Division, the People re-examined the files related not only to Ulerio's case but also to the investigation and indictments of both Sgt. Eiseman and Officer Carsey.

90. **THAT REVIEW REVEALED THAT THE DISTRICT ATTORNEY'S OFFICE HAD KNOWLEDGE OF THE BAD ACTS OF SERGEANT EISEMAN PRIOR TO THE COMMENCEMENT OF ULERIO'S HEARING AND TRIAL BUT THIS INFORMATION HAD NOT BEEN PROVIDED TO ULERIO'S DEFENSE ATTORNEY. (SEE EXHIBIT G)**

91. On April 4, 2017, Ulerio's conviction was vacated and the indictment dismissed.

92. Mr. Ulerio, by this time, had already served a prison sentence of five years.

### FIRST CLAIM FOR RELIEF

#### Monell Claim

93. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-92 of the complaint as if fully set forth herein.

94. The acts complained of were carried out by the aforementioned POLICE DEFENDANTS in their capacities as POLICE OFFICERS and officials pursuant to customs, policies, usages, practices, procedures and rules of the City an NYPD, all under the supervision of ranking officers of the NYPD.

95. The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely searing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference toward to constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

96. At the time of the aforementioned constitutional violations, the City of the NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such as the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference of the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part "infra", the need for more effective supervision and other meaningful attempt to prevent future constitutional violations.

97. The existence of aforesaid unconstitutional customs and polices may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

> a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and

suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

b. Long v. City of New York, 09-CV-6099 (AJK) (S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false compliant and is convicted of falsifying police records);

c. Taylor v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

d. Lin v. City of New York, 10-CV-1936 (PGG)(S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e. Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (In an Order dated November 29, 2009 denying the City's motion to dismiss on Tombley grounds, wherein the police officers at issued were prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> 'informal inquiry by the court and among the judges of this court, as                                                              well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged'

f. People v Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former

undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to pant an innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrest stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion to it. The mentality was that they attach bodies to it; they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it- being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrest officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest during a "vertical patrol" of a public housing project despite evidence that he had legitimate reason to be on premises);

i. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. McMillan v. City of New York, 04-CV-3990 (FB)(RML) (E.D.N.Y.)(Officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.) (same);

l. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y,) (police
officer alleges unlawful retaliation by other police officers after testifying
about corruption in the NYPD);

n.  Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)
(former NYPD lieutenant alleging retaliatory demotion and early
retirement after reporting a fellow officer to IAB and CCRB for the
officer's suspicionless, racially-motivated stop-and – frisk of a group of
Hispanic youths);

o.  Richardson v. City of New York, 02-CV-3651 (JG)(CLP)
(E.D.N.Y.)(Officer fabricated evidence including knowingly false sworn
complaints, against an African-American man in Kings County and
initiated drug charges against him, despite an absence of any quantum of
suspicion);

p.  Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable
issue of fact where NYPD  sergeant alleged retaliatory demotion and
disciplinary chares in response to sergeant's allegations of corruption
within her unit and alleged the NYPD had "unwritten but persuasive
custom of punishing officers who speak out about police misconduct and
encouraging, if not facilitating, silence among officers");

q.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.
Supp. 365 380 (S.D.N.Y., 1997) (holding that the NYPD had an
"unwritten policy or practice of encouraging or at least tolerating a
pattern of harassment directed at officers who exposed instances of
police corruption"); and

r.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis
20250 at 14(E.D.N.Y.) (Police officer alleges retaliatory duty
assignments and harassment in response to his allegations about a
racially-discriminatory workplace; on motion for summary judgment, the
Court held that the police officer had established proof of both a
widespread usage of policy to regulate against police officers who
exposed police misconduct and a failure to train in the police
department).

98. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence,** are further evidenced, inter alia, by the following:

    a. The Mollen Commission concluded that police and falsification of official records is probably the most common form of police corruption facing the criminal justice system, It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrest and never questioned them.
>
> {…}
>
> What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" - doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "what's wrong with that? They're guilty."

    b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."

    c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact,

two other officers had made the arrest and handed the arrest off to Corniel.
The suspect was released. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as
> many as two dozen cases in the past year in which cops allegedly
> made false statements involving routine arrests when the truth
> would have served them just as well.

> That is a significant increase over previous years, sources said. "In
> the past, we'd find this happening once or twice a year, and now
> there are a bunch of them," said one law-enforcement official.

> What has authorities particularly troubled is that officers
> historically lied to cover up more serious corruption, such as the
> cadre of Brooklyn narcotics cops caught stealing drugs from
> dealers and masking their thievery by filing false reports about
> what they had seized.

> But internal probers are not finding that officers appear willing to
> take insidious shortcuts and lie on arrest reports when they are
> processing even routine collars, such as grand larceny, burglaries
> and robberies, sources told the Post.

> Their reasons could range from trying to cut down on paperwork to
> being lazy when filing arrest and incident reports.

d. In 2007, former NYPD officer Dennis Kim admitted to accepting money and
sexual favors from the proprietor of a brothel in Queens County in exchange
for protecting the brothel. Mr. Kim was convicted of those offenses. The
109th precinct of the NYPD, which used to be under Mr. Kim's command, is
also under investigation by the United States Attorney's Office for "Planting
drugs on suspects and stealing cash during gambling raids." The 109th precinct
to be involved in a practice known as "flaking" wherein police officers plant
drugs on suspects in order to being legitimacy to the arrest. According to the
Assistant United States Attorney Monica Evans, member of the 109th Precinct
"maintained a small stash of drugs in an Altoids tin for this purpose."

e. In December 2009, two officers from the 81st Precinct in Brooklyn arrested
and falsely swore out charges against an undercover officer from Internal
Affairs Bureau. As explained in the New York Post:

> The Officers were snared in a sting by Internal Affairs in
> December when they were told to keep an eye out for people
> selling untaxed cigarettes in their precinct.

Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters,' a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.

f.   In early 2010, the City settled a civil rights lawsuit wherein one officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the women $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.

g.   Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations- in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.

**99.** The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact are further evidenced, *inter alia,* by the following:

  a. With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that PLAINTIFFS challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard, " including failure to train and constructive acquiescence. Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

  b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report") dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted-especially a Department that needs the public's confidence and partnership to be affective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread…custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "when it happens, it's not for personal gain. It's more for convenience."

e.

   In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the   subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to   meaningfully discipline or control officer Sbarra-they promoted him to the   rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This show, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and   further   demonstrates   tacit   approval,   condonement,   and/or encouragement of unconstitutional policies, customs, and practices.

f. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct. When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% IN 2007, and approximately 30% in 2008. Alarmingly, the NYPD had refused to prosecute 40% of the cases sent to it by the CCRB in 2009. As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions of the matter was simply dropped by the NYPD rose 66% in 2007. Substantiated complaints of excessive force against

civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.

100.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, are further evidenced, *inter alia*, by the following:

a.  In a suit filed in 2012, officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.

b.  In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.

c.  Former New York County District Attorney Robert Morgenthau had been quoted as acknowledged that, in the NYPD, there is "code of silence," or a "code of protection" that exist among officers and this is followed carefully;

d.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

e.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

101.    The existence of the above-described de facto unlawful polices and/or well-settled
        and widespread customs and practices is known to, encouraged and/or condoned by
        supervisory and policy-making officers and officials of the NYPD and the City,
        including with limitation, Commissioner Kelly.

102.    The actions of Defendants, resulting from and taken pursuant to the above-
        mentioned de facto policies and/or well settled and widespread customs and practices
        of the City, are implemented by members of the NYPD engaging in systematic and
        ubiquitous perjury, both oral and written, to cover up federal law violations committed
        against civilians by either themselves or their fellow officers, supervisors and/or
        subordinates.  They do so with the knowledge and approval of their supervisors,
        commanders and Commissioners Kelly who all: (i) tacitly accept and encourage a
        code of silence wherein police officers refuse to report other officers' misconduct or
        tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in
        statements to the CCRB and the Internal Affair Bureau ("IAB"), and in public
        statements designed to cover for and/or falsely exonerate accused police officers; and
        (ii) encourage and, in the absence of video evidence blatantly exposing the officers'
        perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to
        initiate and continue the malicious prosecution of civilian in order to cover-up civil
        rights violations perpetrated by themselves, fellow office supervisors and/or
        subordinates against those civilians.

103.    All of the foregoing acts by defendants deprived plaintiff of his federally protected
        rights, including, but limited to the constitutional rights enumerated herein.

104.    Defendant City knew or should have known that the acts alleged herein would
deprive plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to
the United States Constitution.

105.    Defendant City is directly liable and responsible for the acts of Defendants, as it
repeatedly and knowingly failed to properly supervise, train, instruct and discipline
them and because it repeatedly and knowingly failed to enforce the rules and
regulations of the City and NYPD, and to require compliance with the Constitution
and laws of the United States.

106.    Despite knowledge of such unlawful de facto policies, practices, and/or customs,
these supervisory ad policy-making officers and officials of the NYPD and the City,
including Commissioner Kelly, have not taken steps to terminate these policies,
practices and/or customs, do not discipline individuals who engage in such polices,
practices and/or customs, or otherwise properly train police officers with regard to the
constitutional and statutory limits on the exercise of their authority, and instead
approve and ratify these policies, practices and/or customs through their active
encouragement of, deliberate indifference to and/or reckless disregard of the effects of
said policies, practices and/or customs or the constitutional right of persons in the City
of New York.

107.    The aforementioned City policies, practices and/or customs of failing to
supervise, train, instruct and discipline police officers and encouraging their
misconduct are evidenced by the police misconduct detailed herein. Specifically,
pursuant to the aforementioned City policies, practices and/or customs, Defendants felt
empowered to arrest plaintiffs without probable cause and then fabricate and swear to

a false story to cover up their blatant violations of plaintiffs' Constitutional rights.
Pursuant to the aforementioned City policies practices and/or customs, the officers
failed to intervene in or report Defendants' violations of plaintiff's rights.

108.    Plaintiff's injuries were a direct and proximate result of the defendant City and
the NYPD's wrongful de facto policies and/or well-settled and widespread customs
and practices and of the knowing and repeated failure of the defendant City and the
NYPD to properly supervise, the train and discipline their police officer.

109.    As a result of the foregoing, plaintiff was deprived of his liberty, which in this
case was five years of incarceration in an upstate prison, and Ulerio had no prior
experience in a jail cell much less a prison, endured psychological and emotional
injury, was devastated mentally from his experience in prison and in addition was
humiliation, costs and expenses and suffered other damages and injuries.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C § 1983 Violations For Malicious Prosecution

110.    Plaintiff repeats and re-alleges each and every allegation contained in
paragraphs "1" through "110" of the complaint as if fully set forth herein.

111.    By their conduct, as described herein, and acting under color of state law,
defendants are liable to plaintiff Willy Ulerio under 42 U.S.C § 1983 for the violation
of his constitutional rights to be free from malicious prosecution under the Fourth and
Fourteenth Amendments to the United States Constitution.

112.    On or about October 10, 2007 the defendants intentionally, and with malice
caused the commencement of a criminal prosecution against Willy Ulerio in the
Criminal Court of the City of New York, County of New York upon the filing of an

accusatory instrument knowing they had violated Ulerio's Fourth Amendment right to be free from unreasonable search and seizure and the arrest was made without probable cause.

**113.** In commencing and continuing the said malicious prosecution, defendants caused Willy Ulerio to be falsely charged and prosecuted and during the prosecution of Willy Ulerio, not only perjured themselves, but intentionally failed to disclose exculpatory evidence that developed during the pendency of the prosecution.

**114.** The defendants knew or should have known through the exercise of reasonable care and proper police procedure that said investigation and further prosecution into this matter was based on police misconduct and a deliberate intention to circumvent the Fourth Amendment by tailoring testimony to advance a pretext for the otherwise illegal conduct. On April 4, 2017, the conviction of Willy Ulerio, finding him guilty by jury trial of Criminal Possession of a weapon in the Second Degree and Criminal Possession of Marijuana in the fourth degree was vacated by the New York County District Attorney's Office, and the trial court, Part 65, the Hon. Daniel J. Fitzgerald, a New York County Supreme Court judge of the criminal term joined in the New York County District Attorney's office recommendation to vacate Willy Ulerio's conviction of March 11, 2009, for the crimes listed herein. On April 12, 2017, the aforementioned conviction was dismissed and all pending criminal charges related to this action were also dismissed by the Hon. Fitzgerald, D., then the presiding judge. The above mentioned dismissal is a termination of the criminal action in favor of **Willy Ulerio**, the accused, pursuant to section 160.50 of the criminal procedure law. (**See Exhibit A**)

**115.** As a direct and proximate result of defendant's unlawful actions, plaintiff has suffered, and will continue to suffer damages including mental and emotional injury, mental anguish, suffering, humiliation, embarrassment, and was incarcerated for 5 years.

### THIRD CLAIM FOR RELIEF

### UNLAWFUL AND UNREASONABLE SEARCH UNDER 42 U.S.C §1983

**116.** Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered "1" through "116" of the complaint as if fully set forth herein.

**117.** As a result of the forgoing plaintiff Willy Ulerio was subjected to an unreasonable search in violation of his due process rights as set forth in the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

**118.** As a result of the aforesaid conduct by defendants, plaintiff's person and possessions were illegally, improperly, and unreasonably searched without a valid warrant, probable cause, privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

### FOURTH CLAIM FOR RELIEF

### FAILURE TO INTERCEDE UNDER 42 U.S.C § 1983

**119.** Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered "1" through "119" of the complaint as if fully set forth herein.

**120.** The defendants had an affirmative duty to intercede when plaintiff's constitutional rights were being violated in defendants' presence.

121. Defendants further violated plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of plaintiff's constitutional rights.

122. As a result of the defendant's failure to intercede when plaintiff's constitutional rights were being violated in defendants' presence, plaintiff sustained, *inter alia*, loss of liberty and emotional injuries.

## FIFTH CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C § 1983

### FAILURE TO DISCLOSE EXCULPATORY MATERIAL

123. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs numbered "1" through "123" of the complaint as if fully set forth herein.

124. All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

125. All of the aforementioned acts deprived plaintiff Willy Ulerio of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C §1983.

126. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

127. Willy Ulerio's constitutional rights were violated as a result of defendant police officer Sergeant Eiseman's failure to turn over exculpatory evidence.

**128.** Defendant Police Officer Sergeant Eiseman had a constitutional obligation to turn over information concerning the New York County District Attorney's office investigation into his police misconduct, to wit: perjury and official misconduct.

**129.** The Due Process clause of the Fourteenth Amendment to the United States Constitution imposes an obligation and duty on the police to turn over exculpatory material to an accused or criminal defendant.

**130.** The material which was not disclosed in the case herein, Sergeant Eiseman's perjury, police misconduct and prior bad acts, was exculpatory by its very nature to plaintiff's underlying criminal case.

**131.** Given the role of Sergeant Eiseman as the supervising officer at the scene of Willy Ulerio's arrest and given the nature of the ultimate allegations against Sergeant Eiseman, the information regarding Eiseman's prior bad acts (Perjury and Misconduct), was information, which as a matter of law, under Brady V. Maryland, would have been relevant to the testimony of the other officers in this case particularly Officer Carsey, and Willy Ulerio was prejudiced by his inability to use this information at both his trial and suppression hearing.

**132.** As a result of the foregoing, plaintiff sustained, inter alia, loss of liberty by serving five years incarceration, emotional distress, mental anguish and deprivation his constitutional rights.


## SIXTH CLAIM

## SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983

133. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs numbered 1" through "133" of the complaint as if fully set forth herein.

134. By his conduct, as described herein, and acting under the color of state law, defendant Sergeant Eiseman had a supervisory role and participated in plaintiff's underlying arrest. The acts, as described herein by defendant Sergeant Eiseman's subordinates, defendant Officer Carsey, defendant Officer Paulino, defendant officer Perez, deprived plaintiff of his rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, as described herein.

135. Defendant Sergeant Eiseman directed his subordinates in the acts and failure to act as described herein, that deprived the plaintiff of the rights described herein. The defendant sergeant, in his role as supervisor, set in motion a series of acts by his fellow defendant subordinates that he knew or reasonably should have known would cause the subordinate defendant officers to deprive the plaintiff of his federal and constitutional rights of the Constitution of the United States as described herein.

## SEVENTH CLAIM FOR RELIEF

### 42 U.S.C. §1983 Federal Civil Rights Violations

136. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "136" of the compliant as if fully set forth herein.

137. All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

**138.** All of the aforementioned acts deprived PLAINIFF of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violations of 42 U.S.C § 1983.

**139.** The Defendants Officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by the Defendant Officers were without authority of law, an abuse of their powers, and said Defendants acted willfully, knowingly, and with the specific intent to deprive the Plaintiff of his constitutional rights secured by Article 1, Section 12 of the New York Constitution and the United States Constitution.

**WHEREFORE**, plaintiff respectfully requests judgement against the Defendants as follows:

1. **On the First Cause of Action against all the defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;**

2. **On the Second cause of Action, against all Defendants, compensatory damages in an amount in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;**

3. On the Third Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

4. On the Fourth Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

5. On the Fifth Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

6. On the Sixth Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

7. On the Seventh Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and reasonable attorney's fees and costs under 42 U.S.C. Section 1988;

8. Such other and further relief as this Court may deem necessary in the interest of justice.

Dated: March 9th, 2018
      Bronx, New York

Rudy Velez, Esq. (RV-7160)
Attorney for Plaintiff
930 Grand Concourse
Suite 1A
Bronx, New York 10451
(917) 674-0573
Fax (212) 481-4853
rvesq@yahoo.com